IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| **CONRAD TRUMAN,**  Plaintiff,  vs.  **CRAIG JOHNSON,**  Defendant. | MEMORANDUM DECISION AND ORDER  Case No. 2:17-cv-775-DAK-CMR  Judge Dale A. Kimball  Magistrate Judge Cecilia M. Romero |

This matter is before the court on Defendant Craig Johnson's Renewed Motion for Summary Judgment [ECF No. 207]. On April 9, 2025, the court held oral argument on the motion. At the hearing, Plaintiff was represented by Shawn P. Bailey, and Defendant was represented by Julia D. Kyte. The court took the motion under advisement. After carefully considering the parties' briefs and arguments as well as the law and facts relevant to the motion, the court issues the following Memorandum Decision and Order on the pending motion.

## BACKGROUND

Plaintiff Conrad Truman alleges that Defendant Craig Johnson, then a Deputy County Attorney in Utah County, knowingly fabricated evidence in the process of prosecuting Truman for the death of Truman's wife, Heidy Truman. Heidy died on October 1, 2012, from a gunshot wound to her right temple. The shot was fired at the Truman residence in Orem, Utah, on September 30, 2012.

On September 30, 2012, the couple had been home doing various things around the house and drinking whiskey. At some point during the evening, Heidy became upset with Conrad. Conrad testified that he was in the kitchen when he heard a pop sound and then saw Heidy enter the kitchen. He saw blood coming from her mouth, she was choking for air, and she fell to the

floor at the top of the stairs. Conrad attempted CPR and called 911. Law enforcement arrived in seven minutes and found Heidy's body at the top of the stairs. She was taken to the hospital, and Conrad remained at the home with police. Just after midnight, Heidy was pronounced dead at the hospital.

Detective Thomas Wallace of the Orem Police Department was appointed as the lead detective investigating Heidy's death. Detective Wallace and an evidence technician arrived at the Truman home around midnight. Detective Wallace assigned officers to gather evidence, interview neighbors, attend the autopsy, collect gunshot residue from Truman and Heidy, and various other tasks. One week after Heidy's death, Detective Wallace wrote a report stating that it appeared unlikely that Heidy had shot herself in the head and walked approximately 12.5 feet to where she had fallen. In a supplemental narrative incident report, Detective Wallace wrote: "I made a hand sketch of the upstairs area where Heidy was located and I pulled measurements with a tape measure." During the months following the shooting, Detective Wallace continued his investigation. This included interviewing witnesses, obtaining various search warrants, and investigative subpoenas seeking a variety of information. There were at least 23 search warrants and 37 investigative subpoenas.

From 2007 to 2020, Craig Johnson was an assistant County Attorney at the Utah County Attorney's Office. For over ten years, he was the only assigned prosecutor/liaison with the Orem Police Department. Johnson visited the crime scene on October 1, 2012, several hours after the shooting. His role in visiting the crime scene was as a prosecuting attorney, not as an investigator. In his years with Utah County, law enforcement gathered and determined the evidence and presented it to him for prosecution. As a prosecuting attorney, Johnson never participated in performing any tasks at crime scenes or in criminal investigations. During the

investigation stage, his job was to assist law enforcement with obtaining search warrants and subpoenas and giving legal advice on the sufficiency of evidence for a probable cause determination.

On October 1, 2012, Johnson visited the crime scene at the Truman residence at 1:03 a.m. Detective Wallace had called him regarding the incident. Johnson was at the scene for only a few minutes. He returned on two other occasions while law enforcement personnel continued with their investigation. Johnson's entry into the home was limited to the living room near the front door and was only for the purpose of discussing the investigation with the law enforcement personnel. When Johnson was at the scene, numerous law enforcement personnel were busy performing various tasks. Johnson does not recall anyone taking measurements.

Dr. Edward Leis at the Utah Medical Examiner's Office issued the original death certificate for Heidy Truman on December 4, 2012, indicating that Heidy's cause of death was a gunshot wound to the head and the manner of death could not be determined. In mid-2013, Detective Wallace informed Johnson that he wanted to make a presentation to Dr. Leis. Detective Wallace informed Johnson that he wanted to present facts to Dr. Leis that he believed confirmed that Heidy did not commit suicide.

On July 17, 2013, Johnson accompanied Detective Wallace to the meeting with Dr. Leis. Also present at the meeting were Orlando Ruiz from the Orem Police Department, Todd Park from the Salt Lake County Unified Police Department, and Keith Stephens, Chief Investigator for the Office of the Medical Examiner. During the meeting, Detective Wallace presented PowerPoint slides that he concluded were facts. Johnson's recollection is that Detective Wallace's slides included measurements Wallace had taken demonstrating that Heidy could not have shot herself and then walked or stumbled to the location where she collapsed. In other

words, Detective Wallace's measurements suggested that Truman had shot her.

There is no evidence that Johnson contributed to or participate in the creation of Detective Wallace's slides. Johnson states that he had not previously viewed the slides. There is no witness testimony that Johnson presented any facts at the meeting with Dr. Leis or said anything of substance to Dr. Leis. Johnson testifies that he was simply there to observe Detective Wallace's presentation.

Having previously worked with Detective Wallace, Johnson believed that he was an experienced, skilled, and dedicated detective. Johnson states that he had no reason to dispute or disbelieve the facts Detective Wallace presented to him or to Dr. Leis. Johnson asserts that he did not participate in how Detective Wallace did the measurements. Had Johnson known that any of the measurements were incorrect, Johnson testifies that he would have taken steps to correct Detective Wallace and make it known to others that the facts were incorrect.

After the meeting, Dr. Leis amended Heidy's death certificate to indicate that her manner of death was homicide. It is unclear when Johnson learned from Detective Wallace that Dr. Leis was amending the manner of death on Heidy's death certificate, but it was before the official manner of death was amended. Johnson then met with Wallace and other prosecuting attorneys about filing a murder charge against Truman. Based on the information they received from Detective Wallace, the prosecuting attorneys decided to file a charge. Johnson testifies that had he known that any facts upon which this decision was based were false or incorrect, he would not have agreed with or supported the decision to file the charge.

Detective Wallace submitted an arrest warrant and signed the affidavit in support of the arrest. Johnson signed the Information filed on July 19, 2013. The Information states: "Based upon evidence received from Tom Wallace, Orem City Police Department, I have reason to

believe the defendant(s) committed the offense(s) as charged herein."

Utah County charged Truman with Heidy's death. Truman was arrested and taken into custody on July 19, 2013. Johnson and Ryan Peters presented evidence at the first trial. This included measurements Johnson received from Detective Wallace and were the same measurements Detective Wallace had presented to Dr. Leis. Johnson presented evidence regarding the measurements through Officer Crook and Detective Wallace, which included diagrams of the crime scene showing where Heidy's body had fallen. Officer Crook and Detective Wallace testified and represented that the diagrams were accurate, were to scale, and were based off measurements Detective Wallace had taken. During the preparation for trial and during trial, there was no indication that the measurements on the scene diagram that Wallace created were inaccurate. Johnson also presented expert testimony from Dr. Leis to demonstrate that Heidy, if she shot herself, could not have traveled to where the diagram showed that she fell from the location that Conrad claimed he first saw her after hearing the pop.

At the first trial, Truman was represented by counsel and his counsel employed an investigator. Both had access to the Truman residence. Neither his counsel nor his investigator questioned Wallace's measurements. The Orem County Attorneys' office employed Englert Forensics as a scene reconstructionist. Johnson attended the scene reconstruction. There is no evidence that anyone involved in the scene reconstruction questioned Detective Wallace's measurements. Johnson decided not to use Englert as an expert and notified Truman's attorney. The letter Johnson sent to defense counsel included Englert's contact information, but there is no evidence that defense counsel ever contacted Englert.

Truman was convicted in Utah state court in October 2014. On October 22, 2014, after the trial ended, the court remanded Truman to the custody of the Utah County Jail. The court

then sentenced Truman and remanded him to the Utah State Prison on February 9, 2015.

Following his conviction, Truman filed a motion for a new trial based in part on an allegation that the evidence presented regarding the distance Heidy traveled was incorrect. Detective Wallace spoke to Johnson and Ryan Peters during the time they were preparing for a response to the motion about the measurement system he used. Wallace tried to explain to them that he had used a measurement system known as FX-3 from Canada that uses a 10-inch foot instead of a 12-inch foot. Once Johnson learned of the incorrect measurements, Johnson lost faith in Detective Wallace and asked to be taken off the case. The court held an evidentiary hearing on June 20, 2016, in which Detective Wallace testified about how he took the measurements at the Truman home. He testified that he told Johnson about the FX-3 system while the County was preparing its response to the motion for a new trial and that he could not recall if he had told him about it prior to trial. However, he also testified that he brought it up at trial when defense counsel was questioning him. He testified that the scale was one to 10-inch for a foot. But he stated that he had not authored any report explaining that he had used that system of measurement. The state court granted a new trial.

Truman's second state court trial was in February 2017. At the second trial, Truman presented evidence regarding the allegedly false evidence from the first trial. At the second trial, Dr. Leis testified that Wallace was the lead investigator and presented the information to him, including the information and scene diagram in Detective Wallace's PowerPoint presentation. The jury acquitted Truman in the second trial, and Truman was released from custody on February 24, 2017. Truman had spent three years and seven months in custody.

In response to Truman's claims in his Amended Complaint in this action, Detective Wallace testified in a Declaration that "[a]lthough I now understand the error, at the time I

6

created the diagrams used in the PowerPoint presentation provided to Dr. Leis and in Trial Exhibit 9, and when the diagrams were used during the criminal proceedings including trial, I believed they were accurate."

Truman filed this case 2017 and has appealed it to the Tenth Circuit twice. On November 20, 2018, Judge Stewart granted Johnson and the Utah County Attorney's Office's Motion to Dismiss Truman's Second, Fifth, Sixth, Seventh, Eighth, and Tenth Causes of Action against them. After the court later granted summary judgment in favor of the other Defendants on all claims, Truman appealed. Truman appealed only the Sixth Cause of Action for fabrication of evidence. On June 25, 2021, the Tenth Circuit found that Johnson was not entitled to qualified immunity on the fabrication of evidence claim at the motion to dismiss stage and affirmed summary judgment in favor of all the other Defendants.

On February 24, 2022, Judge Stewart entered summary judgment in Johnson's favor based on issue preclusion. The court found that the state court had fully adjudicated the fabrication of evidence claim when it decided and denied Truman's Motion to Dismiss for Outrageous Government Conduct. Truman appealed that decision to the Tenth Circuit. On March 21, 2023, the Tenth Circuit reversed the granting of summary judgment, finding that the state court's denial of the motion to dismiss did not trigger or result in issue preclusion, and remanded the case. During the pendency of this action, Detective Wallace and Dr. Leis have both passed away.

## DISCUSSION

### Johnson's Motion for Summary Judgment

Johnson argues that Truman cannot support his claims with any actual evidence and the court should grant summary judgment on the Sixth Cause of Action. There is no evidence that

Johnson fabricated the scene diagram evidence that Detective Wallace presented to Dr. Leis and that the jury considered in the first criminal trial.

To prove a § 1983 claim under the Fourth and Fourteenth Amendments, Truman must show that the withholding or manufacturing of evidence was knowing or intentional. *Truman v. Orem City*, 1 F.4th 1227, 1236 (10th Cir. 2023). "Knowingly" means that the defendant "necessarily must possess knowledge of the evidence's falsity." *Id.* Mere negligence or inadvertence is insufficient as a matter of law. *Id.* Truman recognizes this standard but argues that intent and knowledge are typically proven with circumstantial evidence. Therefore, he contends that making a circumstantial case that Johnson's evidence fabrication was "knowingly" only requires the presentation of evidence from which a reasonable jury could infer knowledge. *Robinson v. Zions Sec. Corp.*, 2010 U.S. Dist. LEXIS 69091, 21 (D. Utah 2010). However, Truman cannot defeat a motion for summary judgment "without offering any concrete evidence" from which a reasonable juror could return a verdict in his favor. *Anderson v. Liberty Lobby*, 477 U.S. 242, 256 (1986).

Truman argues that Johnson had significant personal knowledge of the Truman house and the spot where Heidy fell due to his observations of the scene, participation in the scene reconstruction, and observation of photographs and videos depicting the scene. At this stage of the case, there is no evidence that Johnson possessed knowledge of the measurements being erroneous. He relied on investigators, including Detective Wallace, to do their jobs properly. It was not his job to investigate Heidy's murder or collect evidence. It was not his job to independently verify the measurements Detective Wallace presented to him. As the state court judge observed after the first trial: "The dimension evidence here is newly discovered. It was unknown by any of the counsel before the conclusion of trial. While it is conceivable someone

8

could have thought to go re-measure the house before trial, it is more reasonable that dimensions on the diagram would simply be accepted by trial counsel as the correct dimensions. Counsel should be allowed to rely on police measurements of a crime scene and assume police would not commit a grossly negligent act in labeling a diagram of the scene—particularly in the very bizarre way the labeling occurred in this case."

The evidence is clear that Johnson and other prosecutors did not know that the measurements were incorrect until after the first trial in state court. While Johnson went to the house several times, he was not there in the role of an investigator. He never took measurements, and he relied on Detective Wallace. Detective Wallace did not recall communicating anything to Johnson about the 10-inch foot until Truman's motion for a new trial. Detective Wallace consistently testified to that.

Truman's arguments that Johnson should have known that the measurements were incorrect are not tied to evidence of actual knowledge and egregious conduct. Where others who were at the scene had the job of taking accurate measurements, it is unreasonable to expect the prosecutor to detect or notice that the measurements were incorrect. Truman's defense counsel, who had the responsibility of zealously representing him, did not detect the discrepancies in measurements. And neither did defense counsel's investigator, who was also employed to disprove the prosecution's case.

Truman argues that the court must draw all inferences in his favor, which is true. But those inferences must be drawn from the evidence, not mere speculations. There is no evidence that Johnson knew anything about the discrepancies as to measurements before or during the first trial. There is no evidence from which a reasonable jury could conclude that Johnson had knowledge of the measurement discrepancies.

Truman asserts that evidence that a prosecutor "used investigative techniques that were so coercive and abusive that they knew or should have known that those techniques would yield false information" constitutes circumstantial evidence of evidence fabrication. *Devereaux*, 263 F.3d at 1076. Truman claims that a reasonable jury could conclude that presenting the "distance travelled" theory and the false evidence upon which it was founded to Dr. Leis and withholding conflicting information from Dr. Leis, despite Johnson's visits to the house and participation in the scene reconstruction constituted an investigative technique that was so coercive and abusive that Johnson knew or should have known that it would yield false information. As explained above, there is no evidence to support Truman's arguments with respect to what Johnson knew or should have known based on his visits to the home. Truman's claim that the prosecuting attorney should know more than the investigative officer or defense counsel's investigator are not based on any real evidence. He was never in the home as an investigator, only an observer of others doing such work. There is nothing suggesting that Johnson's decision not to use the work done by Englert, the crime scene reconstructionist, was based on a knowledge that Wallace's information or measurements were incorrect. None of the evidence before the court supports a finding that Johnson's actions were based on coercive or abusive investigative techniques.

Truman also claims that Johnson withheld evidence regarding the Englert scene reconstruction because Johnson did not specifically state that Englert's work was exculpatory. But neither Englert's nor anyone else's notes reflect knowledge that there was a discrepancy in the measurements prior to or during trial. Johnson told defense counsel that he was not using Englert's work and gave defense counsel Englert's contact information. Defense counsel had every opportunity to contact Englert. There is no evidence that Johnson has a credibility problem because he allegedly withheld anything relating to Englert.

Truman further argues that in *Truman I*, the Tenth Circuit stated that "any reasonable prosecutor [should have understood] that providing a medical examiner fabricated evidence and then putting him on the stand to testify based on that false information offends the Constitution." 1 F.4th at 1240-41. But the court made that statement at the motion to dismiss stage. At the summary judgment stage, discovery is closed and nothing new will be uncovered. There is no evidence that Johnson played any role in the meeting with Dr. Leis with respect to the evidence. The evidence demonstrates that he did not participate or assist Detective Wallace in his presentation. Nobody who was at the meeting has testified that Johnson made any kind of presentation at the meeting. Johnson's role in deciding to file charges against Truman was based on the evidence Detective Wallace presented to them.

In any event, Johnson argues that the Power Point presentation to Dr. Leis is not actionable under § 1983 because it did not result in depriving Truman of his liberty. Johnson did not present Detective Wallace's PowerPoint presentation at trial. Only the evidence presented at trial is actionable. Even then, there is no evidence that Johnson had knowledge that he was presenting incorrect evidence to the jury.

Truman also argues that the fact that Johnson charged Truman with murder before Dr. Leis officially amended the manner of death on the death certificate is circumstantial evidence of evidence fabrication and calls into question Johnson's credibility. *Devereaux*, 263 F.3d at 1076. But the incorrect measurements issue is the only remaining issue in Truman's fabrication of evidence claim. The Tenth Circuit recognized that "Truman confined his opening brief to his claim involving false testimony about the dimensions or measurements of the house." *Truman* 60 F.4th at 1270 n.1. Therefore, Truman did not properly appeal anything else with respect to the fabrication of evidence claim. Under the mandate rule, a district court is constrained from

11

considering an issue on remand that a party bypassed on appeal. "[T]he mandate rule prevents a court from considering an argument that could have been, but was not, made on appeal." *SCO Grp, Inc. v. Novell, Inc.*, 2:04-CV-139-TS, 2010 WL 413836, at *1 (D. Utah Jan. 28, 2010).

Moreover, even if the court considered Truman's argument, there is no evidence about when Johnson learned that Dr. Leis was changing his opinion. The only evidence before the court is when the manner of death was officially amended, not when Dr. Leis decided to amend the manner of death. Johnson states that he learned from Wallace that Dr. Leis was going to change the manner of death before the official amended death certificate was entered. Johnson states that an email exchange shows that Wallace did not learn for the first time that the manner of death was being changed by the amended death certificate but rather knew beforehand. Truman does not have any evidence other than speculation to counter that email.

Truman also argues that Johnson enjoys no immunity because he was not acting as an advocate in a judicial proceeding—or otherwise performing a traditional prosecutorial function—when he presented false measurements, diagrams, and statements to Dr. Leis, and withheld conflicting true evidence from Dr. Leis. While prosecutors are immune for conduct "intimately associated with the judicial phase of the criminal process," such as acting as the state's advocate in judicial proceedings, *Imbler v. Pachtman*, 424 U.S. 409, 419 (1976), prosecutors are not immune for actions taken "in the role of an administrator or investigative officer." *Id.* at 430-31. Truman has no evidence to support his assertion that Johnson presented any evidence to Dr. Leis. No witness at the meeting with Dr. Leis testified that Johnson made any kind of presentation. Under oath, Detective Wallace testified that he made the mistake and he did not realize it until after the first trial. Detective Wallace never suggested that Johnson knew of or was a part of the mistake. Detective Wallace created the Power Point presentation

and there is no evidence that Johnson contributed to the presentation in any way. Dr. Leis also testified that Wallace created the PowerPoint presentation and the scene diagrams in it, possible with the help of Orem City crime techs. Dr. Leis did not testify that Johnson was involved in creating the PowerPoint presentation, the crime scene diagram in the presentation, or gave any kind of presentation himself at the meeting. Johnson relied on the facts Wallace conveyed just as Dr. Leis did. Therefore, Truman has no basis for making such an argument.

Truman has not provided any facts to show that Johnson knowingly withheld or fabricated any evidence in his case. The Tenth Circuit made clear that actual knowledge is needed to prevail on the Section 1983 claim and that there must be "the knowing use of false evidence" to proceed to trial, where the plaintiff has to produce facts of "the prosecutor's knowledge that the medical examiner had relied on incorrect dimensions of the house." *Truman v. Johnson*, 60 F.4th 1267, 1271, 1274 (10th Cir. 2023). The inferences Truman asks this court to draw are not reasonable and do not prove actual knowledge. Truman has not provided any direct evidence that Johnson knew the crime scene diagrams and measurements were incorrect. There are no facts to show that anyone knew the information was incorrect before the first trial. The fact that Johnson went to Truman's house several times does not relate to whether he should have caught the error with the measurements. The actual officers who did the measurements did not catch the error. Moreover, Truman had a private investigator who conducted his own investigation and had his own attorney to challenge the detectives' work. None of the regular checks in the litigation process uncovered the mistake prior to or at trial. Despite making many conclusory and unsupported statements that he improperly asserts are facts, Truman does not specifically address the lack of material facts to support that Johnson possibly falsified evidence or knowingly withheld information. Many of Truman's arguments ask the court to make

unreasonable inferences in his favor. It is not reasonable to infer that a prosecutor would compromise a crime scene while officers are investigating, or that he would take upon him the role of investigator when experienced detectives were involved. Conclusory, speculative allegations without any supporting evidence do not raise a genuine issue of material fact, especially in light of the other record evidence that does not support such speculations. While the facts must be viewed in the light most favorable to the nonmoving party, when there is no actual evidence to support a plaintiff's claim, there is no genuine issue for trial.

Truman must show that Johnson knowingly or intentionally manufactured or withheld evidence. There is no evidence that anyone knew of the mistaken measurements before or during the first trial. There is no basis for finding that Johnson withheld information regarding the Englert scene reconstruction when Johnson provided defense counsel with his contact information. Truman's argument that Johnson should have known the measurements were incorrect is insufficient. As the state court judge found, Johnson reasonably relied on the detectives to do their jobs. Truman's own investigator and defense counsel, whose job it was to question the detectives, did not discover the mistakes. There is no evidence or circumstantial evidence that Johnson knew of the mistake or should have known of the mistake before or during the first trial. The record is clear that Johnson did not have actual knowledge of Truman's innocence before or during the first trial and at no time did Johnson use investigative techniques that would rise to a level of coercion or abuse. Accordingly, the court concludes that Johnson is entitled to summary judgment on Truman's remaining fabrication of evidence claim.

## CONCLUSION

Based on the above reasoning, the court GRANTS Defendant Craig Johnson's Renewed Motion for Summary Judgment [ECF No. 207].

DATED this 16th day of June 2025.

BY THE COURT

_____
DALE A. KIMBALL
United States District Judge